*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 11a0014p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

LUAY BATTI,

*Defendant-Appellant.*

No. 09-2050

_____

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 08-20027-001—Gerald E. Rosen, Chief District Judge.

Decided and Filed: January 14, 2011

Before: MOORE, GIBBONS, and McKEAGUE, Circuit Judges.

_____

### COUNSEL

**ON BRIEF:** Melvin Houston, Detroit, Michigan, for Appellant. Graham L. Teall, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

_____

### OPINION

_____

KAREN NELSON MOORE, Circuit Judge. Luay Batti was convicted of improperly accessing information from a protected computer, in violation of 18 U.S.C. § 1030(a)(2)(C) and (c)(2)(B)(iii). He appeals the district court's finding that the value of the information that he obtained exceeded $5,000 and the district court's order of $47,565 in restitution. For the following reasons, we hold that the district court's use of the cost of production of the information obtained here was a reasonable, and therefore permissible, method by which to determine the value of the information obtained by Batti, and that the district court did not abuse its discretion in ordering

restitution in the amount of $47,565.  We therefore **AFFIRM** the judgment of the district court.

## I.  FACTS AND PROCEDURAL HISTORY

Luay Batti worked in the IT department of Campbell-Ewald, an advertising company in Michigan, for about six years, until he was fired in March 2007.  The events leading to his termination began about six months earlier when Batti accessed Campbell-Ewald's computer server and copied confidential computer files belonging to Campbell-Ewald's CEO without authorization.  Although these files were normally stored on the CEO's desktop computer, they had been moved by the company to the company's server while the CEO's computer was being replaced.  Within these files were "confidential pieces of information . . . including executive compensation, financial statements of the firm, goals and objectives for senior executives of the company reporting to the chairman, and some strategic plans."  Dist. Ct. Dkt. ("Doc.") 35 ("Trial Tr.") at 59.

The record does not reveal why Batti retained this information for six months, but, on the evening of February 27, 2007, he went to the office of Campbell-Ewald's Vice Chairman and General Manager, Joseph Naporano, to talk about the information he had obtained.  Batti's ostensible purpose in approaching Naporano was merely to inform him of the weaknesses in Campbell-Ewald's computer-security barriers and to complain about the IT department's management.  At this meeting, Batti also gave Naporano a letter in which Batti set out his complaints and a computer disk containing some of the CEO's files that Batti had copied.  The disk also contained video footage that Campbell-Ewald had purchased for use in television commercials for its largest client, General Motors.  Soon afterwards, Naporano began to investigate the security weaknesses mentioned by Batti, and, within a few days, Naporano fired Batti for exercising "bad judgment" in accessing and copying the CEO's files.  Trial Tr. at 63.

About six weeks later, on April 18, 2007, while the security review was still underway, Naporano learned of two websites that contained confidential information regarding Campbell-Ewald and GM, along with emails sent between officials of these

two companies.  These websites were open to the public for an unknown—yet likely brief—amount of time, but almost immediately after Campbell-Ewald discovered them they became password-protected.  Greatly alarmed by what was clearly a breach of the company's computer-security system, and unaware of exactly how broad the breach was, Naporano contacted the police and an IT security firm, who recommended that Naporano contact the FBI.  The FBI determined that Batti had accessed Campbell-Ewald's confidential files no fewer than twenty-one times after his firing, twice through a Campbell-Ewald server and nineteen times through the email account of another Campbell-Ewald employee, Steve Majoros.  The FBI conducted a search of Batti's home on April 19, 2007.  In an interview with the FBI, Batti admitted that he had accessed Campbell-Ewald's system through its server and Majoros's webmail.  On the latter point, Batti admitted that he had learned Majoros's username and password in the course of his employment with Campbell-Ewald; although Majoros had slightly altered his password after Batti was fired, Batti was able to guess the new password through trial and error.  Finally, after this interview, Batti sent two emails to the FBI in which he attempted to explain his actions.

In addition to the work done by the FBI, the computer-security firm conducted a substantial investigation, and Naporano obtained legal advice regarding the security breach from Campbell-Ewald's outside counsel.  The total cost of the security firm's investigation and the advice from counsel amounted to $47,565.  In addition, many of Campbell-Ewald's employees assisted with the investigation.  In all, Campbell-Ewald employees spent approximately 747 hours dealing with the security breach.

Batti was charged with one count, a violation of 18 U.S.C. § 1030(a)(2)(C) and (c)(2)(B)(iii).  Section 1030(a)(2)(C) sets out the prohibited conduct as follows:

> (a) Whoever . . . (2) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . (C) information from any protected computer . . . shall be punished as provided in subsection (c) of this section.

18 U.S.C. § 1030(a)(2)(C).  Under subsection (c), a violation of subsection (a)(2)(C) can be either a misdemeanor or a felony:

(c) The punishment for an offense under subsection (a) or (b) of this section is . . .

(2)(A) except as provided in subparagraph (B), a fine under this title or imprisonment for not more than one year, or both, in the case of an offense under subsection (a)(2), (a)(3), or (a)(6) of this section which does not occur after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph;

(B) a fine under this title or imprisonment for not more than 5 years, or both, in the case of an offense under subsection (a)(2), or an attempt to commit an offense punishable under this subparagraph, if—

(i) the offense was committed for purposes of commercial advantage or private financial gain;

(ii) the offense was committed in furtherance of any criminal or tortious act in violation of the Constitution or laws of the United States or of any State; or

(iii) the value of the information obtained exceeds $5,000; and

(C) a fine under this title or imprisonment for not more than ten years, or both, in the case of an offense under subsection (a)(2), (a)(3) or (a)(6) of this section which occurs after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph[.]

18 U.S.C. § 1030(c)(2).  In the Indictment, the government sought a felony conviction by alleging, pursuant to subsection (B)(iii), that Batti "obtained information valued in excess of $5,000.00."  Doc. 13 (Indictment) at 1.  The only portion of this charge that Batti challenged in the court below was whether the value of the information that he obtained actually exceeded $5,000.

At a bench trial held on October 28, 2008, the district court heard testimony from FBI Agent Bryan Taube and Naporano regarding Batti's intrusions, the steps taken to investigate and remediate these breaches of security, and the expenditure of $47,565 by Campbell-Ewald for the services of the IT security company and for legal advice. Moreover, the 747 hours spent by Campbell-Ewald employees in response to the

intrusion would have cost $163,549 using Campbell-Ewald's standard government-billing rate. Naporano also testified that Campbell-Ewald paid about $305,000 for the television-commercial footage that Batti accessed and put on the disk that he gave Naporano.

The district court found that the $305,000 amount best represented the value of the information that Batti had obtained in his intrusions; it therefore ruled for the government on the issue of whether the value exceeded $5,000. Doc. 26 (Findings of Fact and Conclusions of Law) at 10–13. In coming to this conclusion, the district court noted that there was virtually no case law interpreting how to define or measure the "value of the information obtained," but it found persuasive cases regarding the value of stolen goods under 18 U.S.C. § 2314. *Id.* at 6–8, 10–11 (citing *United States v. Stegora*, 849 F.2d 291, 292 (8th Cir. 1988); *United States v. Cummings*, 798 F.2d 413, 416 (10th Cir. 1986); *United States v. Drebin*, 557 F.2d 1316, 1331 (9th Cir. 1977); *United States v. Kwan*, No. 02-241; 2003 WL 22973515, at *8–*9 (S.D.N.Y. Dec. 17, 2003) (unpublished opinion)). The courts in these cases held that, where a stolen good does not have any readily ascertainable market value, any reasonable method may be used to calculate its value, including the cost of production, research, or design. *See Stegora*, 849 F.2d at 292 (holding that, in the absence of a market value, "any reasonable method may be employed" to assign a value to an item, including revenue and the cost of development and production) (citations omitted); *Drebin*, 557 F.2d at 1331–32 (holding that a jury instruction allowing valuation by "any reasonable method" was proper); *Kwan*, 2003 WL 22973515, at *8–*9 (allowing the use of the cost of production of stolen goods as a permissible valuation method). Accordingly, the district court looked to Campbell-Ewald's cost of production of the video footage that Batti posted online, which, at approximately $305,000, was well over the $5,000 threshold.

The district court then sentenced Batti to one day in prison, with credit for time served, and thirty-six months of supervised release, the first six months of which the court required Batti to serve in a home-confinement program. Doc. 29 (Judgment) at 2–4. The district court also ordered Batti to pay restitution in the amount of $47,565.

*Id.* at 5.  In reaching this determination, the district court rejected the probation officer's recommendation that the guidelines range be based on a loss of approximately $211,000—a number reached by adding the $47,565 cost of the security firm and legal advice to the $163,549 cost of the 747 hours spent on the issue by Campbell-Ewald employees.  In the district court's view, Campbell-Ewald "overreacted" in response to Batti's actions and the 747 hours spent by Campbell-Ewald employees was "excessive." Doc. 36 (Sent. Hr'g) at 13–16.  As a result, the district court allowed only the $47,565 spent for the security firm and legal advice in calculating Campbell-Ewald's loss for the purposes of sentencing.  *Id.* at 16–17.  This resulted in a guidelines range of six to twelve months in prison, from which the court varied downward to impose the one-day custodial sentence, with credit for time Batti had already served.  *Id.* at 19–20.

Batti now appeals two aspects of his conviction and sentence.  He challenges the district court's conclusion that the value of the information obtained exceeded $5,000, and he argues that the amount of restitution ordered was excessive and unnecessary.  For the following reasons, we reject these arguments.

## II.  THE VALUE OF THE INFORMATION OBTAINED

Batti's challenge to the district court's conclusion that the value of the information obtained exceeded $5,000 requires an interpretation of 18 U.S.C. § 1030(c)(2)(B)(iii).  "A matter requiring statutory interpretation is a question of law requiring de novo review, and the starting point for interpretation is the language of the statute itself." *United States v. Shafer*, 573 F.3d 267, 272 (6th Cir. 2009) (quotation marks omitted).  Section 1030 of Title 18 contains no definition of the term "value," as used in 18 U.S.C. § 1030(c)(2)(B)(iii), however, and § 1030 does not otherwise indicate how a court should determine whether the "value of the information obtained exceeds $5,000." 18 U.S.C. § 1030(c)(2)(B)(iii).

Batti argues that the district court committed a legal error because he asserts that "there was *no* evidence [that his] actions had any impact on the company's use of these commercials." Batti Br. at 18 (emphasis in original, alteration added).  In other words, Batti contends that, because he did not damage the information in any way, the court

could not find that the "value of the information obtained" exceeded $5,000. *Id.* The district court rejected this argument on the ground that the statute does not require that the information obtained lost value as a result of the defendant's illicit actions. As the district court stated:

> There simply is no requirement under the pertinent subsections of § 1030 that Defendant's unauthorized access must have led to any sort of loss, that the value of the information must have been diminished as a result of his conduct, or that he somehow must have profited from his actions. Rather, the trier of fact—in this case, the Court—is called upon only to determine the value of the information through some appropriate means.

Doc. 26 (Findings of Fact and Conclusions of Law) at 12.

We agree with the district court. "When the statutory language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (internal quotation marks omitted); *see also Caminetti v. United States*, 242 U.S. 470, 485, 490 (1917). The statute here requires only a determination of the "value of the information obtained," not whether that value decreased. Furthermore, the statute contains specific definitions of the terms "loss" and "damage," either of which could be said to include an alleged decrease in the value of the video footage obtained by Batti.[1] These terms—"loss" and "damage"—are used in other provisions within § 1030, but not in subsection (c)(2)(B)(iii). *See* 18 U.S.C. § 1030(a)(5)(A) (prohibiting "knowingly caus[ing] the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caus[ing] damage without authorization, to a protected computer); 18 U.S.C. § 1030(a)(5)(B) (prohibiting "intentionally access[ing] a protected computer without authorization, and as a result of such conduct, recklessly caus[ing] damage"); 18 U.S.C. § 1030(a)(5)(C) (prohibiting "intentionally access[ing] a protected computer without authorization, and

---

[1] "[T]he term 'loss' means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service[.]" 18 U.S.C. § 1030(e)(11). "[T]he term 'damage' means any impairment to the integrity or availability of data, a program, a system, or information[.]" 18 U.S.C. § 1030(e)(8).

as a result of such conduct, caus[ing] damage and loss"); 18 U.S.C. § 1030(a)(7)(A) (prohibiting the interstate transmission of any "threat to cause damage to a protected computer"); 18 U.S.C. § 1030(a)(7)(C) (prohibiting the interstate transmission of any "demand or request for money or other thing of value in relation to damage to a protected computer, where such damage was caused to facilitate the extortion"). Given that the terms "loss" and "damage" encompass the type of decrease in value described by Batti, the absence of these terms in § 1030(c)(2)(B)(iii) supports the conclusion that the "value of the information obtained" bears no relation to whether that value was diminished by the defendant's actions. We therefore reject Batti's argument that a diminution in value constitutes the statutory measure.

Batti also argues that the district court "should have used . . . the market value of the information," and that "there was no 'market' available to set a value on the information." Batti Br. at 14. We believe there is also no merit in this argument, because, as we explain below, although there may be no readily ascertainable market value for the video footage that Batti obtained, the cost of production of that footage was a permissible basis on which the district court could rely in determining whether the value of the information obtained exceeded $5,000.

Subsection (a)(2)(C) was added to 18 U.S.C. § 1030 in 1996 in order to "protect against the interstate or foreign theft of information by computer." Economic Espionage Act of 1996, Pub. L. 104-294, Title II, § 201, 110 Stat. 3488, 3491–92 (1996); S. REP. NO. 104-357, at *7, 1996 WL 492169 (1996). In particular, Congress was concerned about the fact that electronically stored information "is intangible, and it has been held that the theft of such information cannot be charged under more traditional criminal statutes such as Interstate Transportation of Stolen Property, 18 U.S.C. § 2314." S. REP. NO. 104-357 at *7 (citing *United States v. Brown*, 925 F.2d 1301, 1308 (10th Cir. 1991)). "[Subsection (a)(2)(C)] ensure[s] that the theft of intangible information by the unauthorized use of a computer is prohibited in the same way theft of physical items are protected." *Id.*

Regarding the penalties for violations of subsection (a)(2)(C), the Senate Report states that violations involving information of "nominal" or "minimal" value constitute misdemeanors, punishable under § 1030(c)(2)(A). S. REP. NO. 104-357 at *8. For violations involving "valuable information" and "misusing information in other more serious ways," however, the felony provision of § 1030(c)(2)(B) applies. *Id.* Furthermore, Congress identified precisely the types of violations worthy of felony punishment by including within § 1030(c)(2)(B) three preconditions to its application. In order to punish a violation of § 1030(a)(2)(C) as a felony, the government must prove one of the following:

> (i) the offense was committed for purposes of commercial advantage or private financial gain;
>
> (ii) the offense was committed in furtherance of any criminal or tortious act in violation of the Constitution or laws of the United States or of any State; or
>
> (iii) the value of the information obtained exceeds $5,000[.]

18 U.S.C. § 1030(c)(2)(B)(i)–(iii). The Senate Report notes that the first two of these preconditions derive from the copyright statute, 17 U.S.C. § 506(a), and the wiretap statute, 18 U.S.C. § 2511(1)(d). S. REP. NO. 104-357 at *8. Moreover, these two provisions "are intended to have the same meaning as in those statutes." *Id.*

Subsection (iii) is similar to the transporting-stolen-goods statute mentioned by the Senate Report as the inspiration for the 1996 amendment, 18 U.S.C. § 2314, in that both require the "value" of the object of the violation to exceed $5,000. Section 2314 prohibits "transport[ing], transmit[ting], or transfer[ring] in interstate or foreign commerce any goods, wares, merchandise, securities or money, *of the value of $5,000 or more*, knowing the same to have been stolen, converted or taken by fraud." 18 U.S.C. § 2314 (emphasis added). Consequently, given the absence of case law interpreting the term "value" in § 1030(c)(2)(B)(iii), we may consider parallel interpretations of § 2314. We also recognize a key difference between the two statutes: although § 1030 prohibits obtaining information, § 2314 prohibits transporting, transmitting, or transferring proscribed items. Thus, as the Senate Report notes, "[t]he crux of the offense under

subsection 1030(a)(2)(C) . . . is the abuse of a computer to obtain the information," and "[a]ctual asportation . . . need not be proved."  S. REP. NO. 104-357 at *7–*8.

Examination of the definition of "value" in 18 U.S.C. § 2311 reveals that the market value of the stolen good constitutes the primary relevant benchmark for the determination of the value of stolen "goods, wares, merchandise, securities or money" in § 2314.  According to § 2311, "'Value' means the face, par, or market value, whichever is the greatest, and the aggregate value of all goods, wares, and merchandise, securities, and money referred to in a single indictment shall constitute the value thereof."  18 U.S.C. § 2311.  Yet when a particular item does not have a readily ascertainable market value, courts have permitted the use of any reasonable method to calculate value, including the cost of production, research, or design.  *See Stegora*, 849 F.2d at 292 (holding that, in the absence of a market value, "any reasonable method may be employed" to assign a value to an item, including revenues and the cost of development and production) (internal quotation marks omitted); *Drebin*, 557 F.2d at 1331–32 (holding that a jury instruction allowing valuation by "any reasonable method" was proper); *Kwan*, 2003 WL 22973515, at *8–*9 (concluding that the cost of production of stolen goods constitutes a permissible valuation method).

With this approach in mind, we believe that, where information obtained by a violation of § 1030(c)(2)(B)(iii) does not have a readily ascertainable market value, it is reasonable to use the cost of production as a means to determine the value of the information obtained.  The district court here believed that the amount Campbell-Ewald paid for the "spots" or video footage that Batti later obtained could be viewed as the footage's market value, but the district court also recognized that footage of this type is not sold on a typical retail market.  Doc. 26 (Findings of Fact and Conclusions of Law) at 11.  As a result, the district court believed that the amount that Campbell-Ewald paid for the footage could also be viewed as the cost of production for the development of advertisements or commercials.  *Id.*  We see no error in this approach. Section 1030(a)(2)(C) protects, broadly, "information [obtained] from any protected computer," and it is often the case, as it was here, that this information is intangible and

lacks any easily ascertainable market value. In such circumstances, we approve of the use of "any reasonable method" to determine the value of information obtained by a breach of § 1030(a)(2)(C), whether this determination is being made by the district court in a bench trial or by a jury. We hold that the district court's use of the cost of production here was a reasonable, and therefore permissible, method by which to determine the value of the information obtained by Batti. We recognize, however, that, given the broad nature of the statute, violations of § 1030(a)(2)(C) may arise in many different contexts. We therefore express no opinion regarding either the propriety of other methods by which to calculate the value of information obtained under 18 U.S.C. § 1030(a)(2)(C) and (c)(2)(B)(iii) or the applicability of the method we approve today to dissimilar factual circumstances.

### III.  THE AMOUNT OF RESTITUTION

Batti's second argument on appeal relates to the district court's award of restitution pursuant to 18 U.S.C. § 3663A(a)(1), which requires the district court to award restitution when, according to subsection (c)(1)(B), "an identifiable victim or victims has suffered a physical injury or pecuniary loss." In ordering restitution under § 3663A, the district court must require the defendant to "reimburse the victim for lost income and necessary . . . expenses incurred during participation in the investigation or prosecution of the offense[.]"   18 U.S.C. § 3663A(b)(4); *see also* 18 U.S.C. 3664(f)(1)(A) ("In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant."). The statute further provides that "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence." 18 U.S.C. § 3664(e).

Batti claims that the district court's order of restitution was based in part on expenses of Campbell-Ewald that were unreasonable and unnecessary. In particular, Batti argues that over half of the $47,565 that he is required to pay—$25,656 to be precise—was charged by the computer-security firm hired by Campbell-Ewald for surveillance of his actions and movements after April 18, 2007, by which time law-

enforcement authorities had already become involved in the investigation. In Batti's view, this surveillance was unnecessary, thereby making it improper for the district court to include the cost of surveillance as part of a restitution award.

"We review de novo '[w]hether a restitution order is permitted under the law.' If we determine that restitution is permissible, then the amount of restitution ordered by the district court is reviewed under the abuse-of-discretion standard." *United States v. Williams*, 612 F.3d 500, 509 (6th Cir. 2010) (internal citation omitted).[2] Batti's argument relates to the amount of restitution ordered, so we review for abuse of discretion. "An abuse of discretion occurs when the reviewing court is left with the definite and firm conviction that the trial court committed a clear error of judgment." *United States v. Hunt*, 521 F.3d 636, 648 (6th Cir. 2008) (internal quotation marks omitted).

We see no abuse of discretion in the district court's restitution order of $47,565. Batti has not developed his assertion that the surveillance by the computer-security firm was unnecessary and excessive, beyond what he claims are "unanswered questions," namely: "Why the need for so much surveillance, particularly given that state police authorities were immediately alerted, was never addressed on the record. In addition, how this surveillance related to the investigation conducted by the law firm was also never addressed." Batti Br. at 21 (citing Trial Tr. at 77–79). The district court, however, gave close consideration to each of the government's requested bases for an order of restitution. The district court first rejected the notion that restitution was warranted for the 747 hours of employee time spent in reaction to Batti's actions; it believed that this reaction by Campbell-Ewald was "excessive." Sent. Hr'g Tr. at 15–16. The hiring of the computer-security firm and legal counsel, on the other hand, was acceptable to the court. It believed that these actions were "perhaps a little bit of an overreaction, [but]

---

[2]Although Batti did not object to the district court's restitution order at the sentencing hearing, which would ordinarily result in the application of plain-error review to this claim, we apply the conventional standard of review here because the district court did not clearly ask whether either of the parties had any additional objections at the end of the sentencing hearing, in accordance with *United States v. Bostic*, 371 F.3d 865 (6th Cir. 2004). Instead, the court asked only whether there was "[a]nything else concerning sentence?" Sent. Hr'g Tr. at 23. This is insufficient to meet the requirement of *Bostic*. *United States v. Wettstain*, 618 F.3d 577, 592–93 (6th Cir. 2010).

not outside the pa[le]." *Id.* at 16. More specifically, the district court noted that the "charges of the computer security consultant seemed in line with the scope of the work that it was given to investigate." *Id.* at 17. On this point, Taube testified at the bench trial that "Campbell-Ewald had set up surveillance on Mr. Batti because they were worried about some physical security problems. And the surveillance observed Mr. Batti at Bloomfield Township Library on [April] 23rd," the date on which Batti again tried to access Campbell-Ewald's computer server. Trial Tr. at 27. The "physical security problems" to which Taube referred were mentioned by Naporano, as well, who testified that "[a]t that time, there were several employees or former employees or disgruntled employees that had returned to their place of employment and caused violence. I was very sensitive to that and so that was the purpose of the surveillance." *Id.* at 130. Given this evidence, we see no error in the district court's order of restitution. We are not left with a "definite and firm conviction that the trial court committed a clear error of judgment." *Hunt*, 521 F.3d at 648; *see, e.g.*, *United States v. Hamad*, 300 F. App'x 401, 407–09 (6th Cir. 2008) (unpublished opinion) (holding that the district court did not abuse its discretion in ordering $320,000 in restitution where sufficient evidence existed in the record on which the district court could base a finding that $320,000 had been lost by the victim).

## IV.  CONCLUSION

For these reasons, we hold that the district court's use of the cost of production here was a reasonable, and therefore permissible, method by which to determine the value of the information obtained by Batti, and that the district court did not abuse its discretion in ordering restitution in the amount of $47,565. We therefore **AFFIRM** the judgment of the district court.