RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 11a0081p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

            *v.*                                           No. 09-4158

CHRISTOPHER FREEMAN,
                    *Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 09-00030-001—Michael R. Barrett, District Judge.

Decided and Filed: April 4, 2011

Before: GILMAN, GIBBONS, and COOK, Circuit Judges.

_____

**COUNSEL**

**ON BRIEF:** Kevin M. Schad, ASSISTANT FEDERAL PUBLIC DEFENDER, Cincinnati, Ohio, for Appellant. Timothy D. Oakley, Benjamin C. Glassman, ASSISTANT UNITED STATES ATTORNEYS, Cincinnati, Ohio, for Appellee.

_____

**OPINION**

_____

RONALD LEE GILMAN, Circuit Judge. Christopher Freeman pled guilty to one count of possessing stolen firearms, in violation of 18 U.S.C. § 922(j). The district court imposed a sentence of 43 months' imprisonment and $27,000 in restitution for the value of the stolen weapons, minus the value of any items that are recovered. This prison term is 6 months above the applicable United States Sentencing Guidelines (U.S.S.G.) range of 30 to 37 months.

1

Freeman objected at sentencing to the district court's imposition of a sentencing enhancement based on his trafficking in the stolen firearms, as well as to the court's upward departure based on exceptional circumstances. In addition to raising these issues again on appeal, he objects to the court's restitution order. For the reasons set forth below, we **AFFIRM** the term of imprisonment imposed by the district court, but **REVERSE** the court's restitution order and **REMAND** the case for further consideration regarding the issue of restitution.

## I. BACKGROUND

Freeman admitted in his plea agreement that he and his accomplice, Christopher Roehm, were involved in the disposal of approximately 34 firearms that were stolen from the Arcade Antiques and Gun Shop (the Arcade) in Bethel, Ohio in February 2009. Roehm sold eight of the weapons to an undercover agent from the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). Another firearm from the Arcade was recovered from Roehm's car when he was arrested shortly after the sale to the undercover agent. Freeman then sold three more of the weapons to a different ATF agent in a transaction that Roehm arranged while cooperating with the authorities. At this meeting, Roehm gave Freeman the cash that Roehm had previously been paid by the first ATF agent. Freeman also offered the second ATF agent additional firearms that Freeman claimed were located at another site. According to the plea agreement, the ATF agent lost contact with Freeman when Freeman departed, purportedly to retrieve the additional weapons.

## A.     The Presentence Report (PSR)

At Freeman's sentencing hearing, the district court adopted the factual findings contained in the PSR. The PSR explains that, on the day of the burglary, Freeman told an acquaintance that Freeman had once attempted to break into the Arcade, but that he had had to flee when a police officer arrived in the area. Freeman also told this acquaintance that he planned to break into the Arcade because there was easy access through a window. Later that evening, while Freeman's sister and an unidentified

juvenile were waiting in a car, he left with a crow bar and a black duffle bag and returned with the bag full of firearms. Freeman told his sister that he had broken into the Arcade. Aided by the juvenile, Freeman sold a total of five of the firearms to his cousin, his uncle, and a drug dealer on the night of the break-in. Freeman then enlisted Roehm's assistance to sell more of the stolen firearms. Sometime after 4 a.m. the following morning, Freeman and Roehm proceeded to sell several of the firearms to their own heroin dealer in exchange for $400 and approximately five grams of heroin. Roehm sold one more firearm before he and Freeman parted ways.

They reconvened shortly thereafter, with Freeman giving Roehm eight more firearms to sell. Freeman told Roehm that he had stolen approximately 40 firearms and had about 12 remaining. Roehm then sold the eight firearms that he had been given by Freeman to an undercover ATF agent. After his arrest, Roehm proceeded to cooperate with the police and assisted in arranging for the sale of three firearms between Freeman and a second undercover ATF agent. Freeman, Roehm, and the agent then traveled to Freeman's apartment, where Freeman claimed that he had other firearms for sale. Despite Freeman's inability to enter the apartment because he had misplaced the key, he obtained payment for the three firearms that he was selling to the agent.

A few days later, Freeman was arrested. He subsequently admitted selling three firearms to the undercover agent. Freeman also acknowledged that he had told the agent that he had more firearms for sale at his apartment in an attempt to lure the agent, who Freeman suspected was an undercover agent, to his apartment for the purpose of robbing him at gunpoint. Because he observed that the buyer had more money, Freeman had hoped to take this additional money, retrieve the firearms that he had already sold, and escape. This plan was foiled when Freeman was unable to gain entry to his apartment. According to the PSR, Freeman denied burglarizing the Arcade and claimed that he had obtained all of the firearms from Roehm.

**B.      Freeman's sentencing**

As part of his plea agreement, Freeman waived the right to appeal his sentence "except for the grounds that (a) the sentence includes a term of custody that exceeds the maximum Guideline imprisonment range, or (b) the sentence exceeds the statutory maximum penalty." The district court determined that Freeman's base offense level under the Guidelines for possessing stolen firearms in violation of 18 U.S.C. § 922(j) was 12. This level was increased by six based on U.S.S.G. § 2K2.1(b)(1)(C) because the offense involved between 25 and 99 firearms. The court also imposed a four-level enhancement for trafficking in firearms based on U.S.S.G. § 2K2.1(b)(5). In addition, the court addressed a possible four-level enhancement under U.S.S.G. § 2K2.1(b)(6) for using or possessing a firearm in connection with another felony offense. But the court clarified before calculating Freeman's total Guidelines range that it had misspoken and had actually intended to impose the four-level enhancement under § 2K2.1(b)(5). Finally, as suggested by the PSR, the court reduced Freeman's offense level by three based on Freeman's acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a)-(b). A final offense level of 19 and criminal history category of I brought his applicable Guidelines range to 30 to 37 months in prison.

Freeman argued that the district court's imposition of a four-level enhancement for trafficking in firearms constituted impermissible double counting because his conviction and the enhancement were both predicated on his selling firearms. The government responded that the enhancement for trafficking in the firearms was not accounted for by Freeman's conviction because Freeman could have been convicted solely for having received or having possessed the stolen firearms, even if he did not sell them to a third party. Moreover, the government argued, even if Freeman's conviction did account for his trafficking in the firearms, the four-level enhancement for trafficking concerned a distinct aspect of Freeman's conduct in that his 12-point base offense level accounted only for his possession of, but not his trafficking in, the firearms. The court agreed with the government's position and overruled Freeman's objection to the four-level enhancement.

After the district court discussed the various 18 U.S.C. § 3553(a) sentencing factors, it concluded that an upward departure under U.S.S.G. § 5K2.0(a)(2)(B) was appropriate. This provision allows for departures from the defendant's putative Guidelines range "in the exceptional case in which there is present a circumstance that the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence." U.S.S.G. § 5K2.0(a)(2)(B). The court explained that because Freeman admitted that he had planned on robbing the undercover agent at gunpoint, and did not carry out this plan only because he was unable to unlock the door to his apartment, an upward departure was warranted. In making this determination, the court also compared Freeman's sentence to the types of sentences that the court generally imposed in these types of situations, as well as the fact that Freeman, "the younger junkie[,] was leading the older junkie [Roehm] down the path in this case." The court ultimately imposed a sentence of 43 months in prison, which constituted a 6-month upward departure from the Guidelines range of 30 to 37 months that would have otherwise been applicable.

In addition, the district court ordered Freeman to pay $27,000 in restitution, minus the value of any firearms that are recovered. When the court first suggested this restitution amount, Freeman's attorney stated that Freeman was "willing to make every effort, once he is employed, to try to make recompense for his wrongs here." But when the court actually ordered restitution at the end of sentencing, the probation officer pointed out that restitution is limited to the count of conviction, and that the only firearms referenced in the indictment were the ones that were a part of the transactions with the undercover agents. The probation officer further observed that restitution was not appropriate in this case because all of the firearms referenced in the indictment were recovered. In response, the government asserted that "the relevant conduct would be such that the restitution would be appropriate."

The PSR noted that the total value of the stolen firearms was approximately $26,000 (rather than the $27,000 referenced by the court), minus approximately $8,000 for the 12 firearms retrieved by the undercover agents, leaving the Arcade's total loss

at approximately $18,000. Moreover, the Arcade's owner recovered most of his losses through an insurance claim that he filed.

## II.  ANALYSIS

On appeal, Freemam objects to three aspects of his sentence. He first objects to the district court's four-level enhancement under U.S.S.G. § 2K2.1(b)(5) for his trafficking in firearms because, as he argued at sentencing, he claims that this constituted impermissible double counting. To this first objection, Freeman now adds the argument that the court did not make proper findings to support this enhancement. He next contends that the court's findings were insufficient to support its upward departure under § 5K2.0(a)(2)(B) based on exceptional circumstances that were allegedly not accounted for by the Guidelines. Finally, Freeman argues that the district court's restitution order was imposed in error because the conduct underlying the order was not part of the offense for which he was convicted.

## A.       Standard of review

Sentences in criminal cases are reviewed for procedural and substantive reasonableness. *Gall v. United States*, 552 U.S. 38, 51 (2007). This review is conducted under the deferential abuse-of-discretion standard. *United States v. Novales*, 589 F.3d 310, 314 (6th Cir. 2009). Substantive-reasonableness claims do not need to be raised before the district court to be preserved for appeal. *United States v. Penson*, 526 F.3d 331, 337 (6th Cir. 2008). But "if a sentencing judge asks . . . whether there are any objections not previously raised, in compliance with the procedural rule set forth in *United States v. Bostic*, 371 F.3d 865 (2004)[,] and if the relevant party does not object, then plain-error review applies on appeal" to those procedural-reasonableness arguments that were not preserved in the district court. *Penson*, 526 F.3d at 337 (alterations and internal quotation marks omitted) (quoting *United States v. Vonner*, 516 F.3d 382, 385 (6th Cir. 2008) (en banc)).

In the present case, after the district court imposed Freeman's sentence, including the amount of restitution, it asked Freeman's counsel: "Richard, do you want to renew

your previously-raised objections for the record?" Freeman's counsel responded to this question by renewing two objections to the court's term of imprisonment that he had previously raised in the sentencing hearing. Although Freeman's counsel clarified that he was renewing his objections pursuant to *Bostic*, the purpose of the *Bostic* question is to allow the parties to raise objections "that have not previously been raised." *Bostic*, 371 F.3d at 872. Asking the parties whether they want to renew their *previously raised* objections, as the district court did here, does not address *Bostic*'s primary concern of giving the parties a final opportunity to raise *new* objections. *See United States v. Batti*, 631 F.3d 371, 379 n.2 (6th Cir. 2011) (holding that the district court's question of whether there was "[a]nything else concerning sentence?" did not satisfy *Bostic*'s requirement of asking whether the parties have "any *additional* objections at the end of the sentencing hearing" (emphasis added)).

Freeman's objections on appeal to his term of imprisonment will therefore be reviewed under the abuse-of-discretion standard as if they had been raised below because the district court failed to properly ask the *Bostic* question. Under this standard, "[t]he district court's legal interpretation[s] of the Guidelines are reviewed de novo, but its factual findings will not be set aside unless they are clearly erroneous." *United States v. Brooks*, 628 F.3d 791, 796 (6th Cir. 2011).

We next turn to the district court's restitution order. If a party does not object at sentencing to the restitution order, then the order is also reviewed under the plain-error standard. *Batti*, 631 F.3d at 379 n.2. But, as is the case with procedural-reasonableness objections, if the district court fails to ask the *Bostic* question, then the default abuse-of-discretion standard of review applies. *Id.*

The fact that Freeman's counsel stated early in the sentencing hearing that he did not have any objections to the district court's proposed restitution order does not obviate the need for a proper *Bostic* question concerning restitution. This is especially true here because, towards the end of the hearing, the probation officer stated that he doubted the court's ability to order any restitution since all of the firearms related to Count 1 of the indictment were recovered. Despite this "red flag" alert, Freeman has conceded on

appeal that his challenge to the district court's restitution order should be reviewed for plain error because he did not raise his challenge at sentencing. Although we might still be able to review this challenge as if it had been raised below because "a party cannot 'waive' the proper standard of review by failing to argue it," *see Brown v. Smith*, 551 F.3d 424, 428 n.2 (6th Cir. 2008), we need not further address this issue because we have concluded that the restitution order should be reversed even under the more deferential plain-error standard of review.

**B.     Freeman's four-level enhancement under U.S.S.G. § 2K2.1(b)(5)**

### *1.     Double counting*

Freeman argues that his four-level enhancement under U.S.S.G. § 2K2.1(b)(5) for trafficking in firearms impermissibly double counts his selling firearms to an undercover agent because, "in order to convict him of the offense of conviction, the Government needed to, and did, prove that he trafficked in firearms." He bases this argument on the fact that Count 1 of the indictment, to which he pled guilty, alleges that Freeman knowingly disposed of the weapons that he unlawfully possessed, all in violation of 18 U.S.C. § 922(j). As such, according to Freeman, his trafficking in firearms is accounted for in both his initial base offense level and in the § 2K2.1(b)(5) enhancement.

Freeman errs, however, in arguing that because his offense of conviction included the disposal of stolen firearms, his initial offense level must have accounted for this activity as well. Regardless of whether Freeman's trafficking was accounted for in his offense of conviction, this conduct factored into the district court's Guidelines calculation only once. Freeman's base offense level of 12, under U.S.S.G. § 2K2.1(a)(7), is based solely on his unlawful possession of firearms, with no weight being given to his trafficking of these, or any related, firearms. "The guideline applied by the court, U.S.S.G. § 2K2.1 . . . , identifies possession alone as a crime . . . . Thus, the Sentencing Commission recognized that the guideline would be applied to crimes involving mere possession of an illegal weapon, regardless of the circumstances under which it was acquired." *United States v. Dalecke*, 29 F.3d 1044, 1047 (6th Cir. 1994).

Freeman's base offense level of 12 under § 2K2.1(a)(7) and his four-level enhancement for trafficking pursuant to § 2K2.1(b)(5) are thus punishing entirely different aspects of his crime. *See United States v. Wheeler*, 330 F.3d 407, 414 (6th Cir. 2003) (holding that no impermissible double counting occurs where "each of the guidelines applied by the District Court . . . emphasizes different aspects of Defendant's conduct"); *see also United States v. Hayes*, 399 F. App'x 57, 61-62 (6th Cir. 2010) ("Although the enhancement and the conviction arose from the same conduct, they punished different aspects of the defendant's conduct. The first was his brandishing of the gun; the second was the physical restraint. So there was no double-counting." (alterations, citations, and internal quotation marks omitted)).

### 2.      *Disputes at sentencing under Rule 32(i)(3)(B) of the Federal Rules of Criminal Procedure*

Freeman also objects that, in imposing the U.S.S.G. § 2K2.1(b)(5) enhancement, the district court violated Rule 32(i)(3)(B) of the Federal Rules of Criminal Procedure by not making adequate findings of fact to support the enhancement. "[F]or any disputed portion of the presentence report or other controverted matter," this Rule requires the court to "rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B). When the court explicitly asked the parties at sentencing if they disagreed with the PSR before adopting its factual findings, Freeman did not object to the findings related to the § 2K2.1(b)(5) enhancement. The court therefore did not violate Rule 32(i)(3)(B). *See United States v. Treadway*, 328 F.3d 878, 886 (6th Cir. 2003) ("We can find no reason to require a district court to make independent findings outside the PSR when the facts are undisputed.")

### 3.      *Support for the U.S.S.G. § 2K2.1(b)(5) enhancement*

Freeman's final argument relating to § 2K2.1(b)(5) is that the district court did not make the necessary findings as set out in the Commentary to the Guidelines for that section. This provision's Application Note states that § 2K2.1(b)(5) applies to a defendant who (1) "disposed of two or more firearms to another individual," and

(2) "knew or had reason to believe that such conduct would result in the . . . disposal of a firearm to an individual—(I) whose possession or receipt of the firearm would be unlawful; or (II) who intended to use or dispose of the firearm unlawfully." U.S.S.G. § 2K2.1 cmt. n.13. The district court is required to find the facts supporting this provision by a preponderance of the evidence. *United States v. Goodman*, 519 F.3d 310, 321 (6th Cir. 2008) (explaining that for a prior version of § 2K2.1(b)(5) to apply to the use or possession of a firearm in connection with another felony offense, the government had to prove by a preponderance of the evidence that the firearm aided the felonious conduct (internal quotation marks omitted)).

This circuit has not yet interpreted U.S.S.G. § 2K2.1(b)(5) to determine at what point a defendant would know or have reason to believe that the transferee intended to use the transferred firearms unlawfully. But cases interpreting the prior version of § 2K2.1(b)(5), which required that the defendant have reason to believe that the firearms "would be used or possessed in connection with another felony offense," support the district court's application of the current version of § 2K2.1(b)(5) in the present case. *See United States v. Cummings*, No. 93-2037, 1994 WL 91825, at *2 (6th Cir. Mar. 22, 1994) (unpublished opinion) (holding that the application of § 2K2.1(b)(5) was appropriate where "the volume of Cummings' gun sales was significant; handguns constituted the largest proportion of the weapons sold; Cummings knew his customers were criminals; and his customers knew the guns were stolen"); *see also United States v. Cutler*, 36 F.3d 406, 407-08 (4th Cir. 1994) (holding that § 2K2.1(b)(5) applied where the defendant had reason to believe that the firearms were sold to drug abusers and to violent drug dealers whom the defendant feared), *cited favorably by United States v. Cobb*, 250 F.3d 346, 349 (6th Cir. 2001).

Decisions from our sister circuits interpreting the current version of § 2K2.1(b)(5) also support the conclusion that this provision applies in the present case. *See United States v. Juarez*, 626 F.3d 246, 252 (5th Cir. 2010) (holding that the fact that the transferee "did not wish to be associated with the [firearms] transactions," the secretive nature of the defendant's dealings with the transferee, "and the fact that she

was paid $200 above the retail cost of each of twenty-five weapons . . . would give Juarez reason to believe that the firearms were being purchased for an unlawful purpose"); *United States v. Mena*, 342 F. App'x 656, 658 (2d Cir. 2009) (holding that there was no clear error in the district court's finding that "the circumstances [of the offense conduct] indicate by a preponderance of the evidence that [Mena] knew or had reason to believe that his delivery of the firearms was to someone or people who intended to use or dispose of the firearms unlawfully" where the defendant "twice delivered guns in a plastic bag in exchange for cash on a street in Manhattan" (alterations in original) (internal quotation marks omitted)).

Based on the facts included in the PSR, the district court found that Freeman "participated in transporting, transferring and dispos[ing] of two or more firearms to another individual." The court also found that Freeman and Roehm "bartered and sold guns to a drug dealer." We have no problem concluding that Freeman's sale of firearms to his heroin dealer in the wee hours of the morning in exchange for heroin and cash gave him reason to know or have reason to believe that his heroin dealer "intended to use or dispose of the firearm unlawfully." U.S.S.G. § 2K2.1(b)(5) cmt. n.13.

Furthermore, Freeman's sale of firearms to his heroin dealer can form the basis for the district court's § 2K2.1(b)(5) enhancement even though he was not charged with this conduct. Under U.S.S.G. § 1B1.3(a)(2), uncharged conduct may be considered in determining specific offense characteristics (such as those covered by § 2K2.1(b)(5)), when such conduct is "part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2); *see also United States v. Gill*, 348 F.3d 147, 153-55 (6th Cir. 2003) (noting that U.S.S.G. § 1B1.3(a)(2) may apply to a conviction for possession of a controlled substance with intent to distribute).

In order to be considered part of the same course of conduct or common scheme as the offense of conviction, U.S.S.G. § 1B1.3(a)(2) requires that multiple counts based on the offenses be grouped under U.S.S.G. § 3D1.2(d). Under § 3D1.2(d), counts involving substantially the same harm are to be grouped together where "the offense level is determined largely on the basis of the total amount of harm or loss, the quantity

of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior." "[O]ffenses covered by § 2K2.1 of the Guidelines," such as Freeman's offense of conviction and the uncharged conduct of selling firearms to his heroin dealer, "are to be grouped under this subsection." *See Jenkins v. United States*, 394 F.3d 407, 411 (6th Cir. 2005) (quoting U.S.S.G. § 3D1.2(d)). In considering this uncharged conduct, the district court could properly take into account conduct beyond the scope of the defendant's plea agreement. *See United States v. Velez*, 1 F.3d 386, 389 (6th Cir. 1993) (allowing the district court to consider uncharged conduct in imposing a sentencing enhancement even though this conduct was beyond the scope of the defendant's plea agreement). The district court in the present case was thus allowed to consider Freeman's uncharged conduct in imposing the § 2K2.1(b)(5) enhancement even though, as will be explained below, the court could not consider this conduct in determining the proper amount of restitution that he owes.

Another condition that must be met in order for § 2K2.1(b)(5) to apply is that "there must be a relationship between firearms that form part of the relevant conduct and the firearms that are part of the offense of conviction." *United States v. Howse*, 478 F.3d 729, 732 (6th Cir. 2007) (internal quotation marks omitted) (remanding for the district court to determine whether a clear connection existed between the firearm that was part of the offense of conviction and the firearm that was possessed during the enhancement offense). This requirement is satisfied in the present case. The firearms that form the basis of the § 2K2.1(b)(5) enhancement (i.e., the firearms that Freeman sold to his heroin dealer) are connected to the firearms that form the basis for the offense of conviction (i.e., the firearms sold to the undercover agents) because they were all acquired as part of the same burglary and all sold in the same course of conduct.

Although the district court could have explained more clearly its conclusion that Freeman's furtive sale of weapons to his heroin dealer satisfied § 2K2.1(b)(5)'s requirement that he "knew or had reason to believe that such conduct would result in the . . . disposal of a firearm to an individual . . . who intended to use or dispose of the

firearm unlawfully," we find no abuse of discretion in the application of this four-level enhancement. *See United States v. Hall*, — F.3d —, 2011 WL 134232, at *3 (6th Cir. Jan. 18, 2011) (published opinion) ("Though the district court did not mention § 5G1.3 specifically, in light of its entire explanation, it is evident that the district court considered § 5G1.3(c) and adequately explained its reasons for applying it when sentencing Hall.").

**C.      The district court's upward departure under U.S.S.G. § 5K2.0(a)(2)(B)**

Freeman also objects to the district court's upward departure, pursuant to U.S.S.G. § 5K2.0(a)(2)(B), which allows for departures "in the exceptional case in which there is present a circumstance that the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence." The court imposed a sentence that was six months longer than the top of the applicable Guidelines range based on Freeman's admission that he had planned to rob the undercover agent at gunpoint inside Freeman's apartment, but was prevented from doing so only because he did not have the key to the apartment with him at the time.

Although the government argues that this upward adjustment to Freeman's sentence was a variance rather than a departure, the sentencing transcript makes clear that the district court imposed the additional months of imprisonment as an upward departure. The court explicitly stated that § 5K2.0(a)(2)(B) permits the departure, explaining that "I think that the upward departure is warranted in this case." Our review will therefore focus on whether this adjustment was a proper departure under U.S.S.G. § 5K2.0(a)(2)(B).

> **1.      *Evaluation of whether U.S.S.G. § 5K2.0(a)(2)(B) or § 2K2.1(b)(6) applies to Freeman's conduct***

Freeman contends that "the circumstance relied upon by the court, that [Freeman] was planning on robbing [the undercover agent], was not one which is 'not identified in the guidelines'" because § 2K2.1(b)(6) covers the use or

possession of a firearm in combination with another offense. He argues, in other words, that the planned robbery of the undercover agent was just the sort of "other offense" contemplated by the Guidelines. Freeman is correct that § 5K2.0(a)(2)(B) does not apply to conduct that could be punished by another Guidelines provision because, in such a situation, the conduct at issue cannot be considered "a circumstance that the Commission has not identified in the guidelines." *See United States v. Waugh*, 207 F.3d 1098, 1101 (8th Cir. 2000) (holding that the district court erred in imposing an "enhancement" under the § 5K2.0 departure provision where an enhancement under the separate Guidelines provision for restraining a victim during the course of an offense would have been appropriate).

But the district court's imposition of the § 5K2.0(a)(2)(B) departure was appropriate here because the evidence does not show that Freeman's planned robbery of the undercover agent was necessarily subject to the § 2K2.1(b)(6) enhancement. An enhancement pursuant to § 2K2.1(b)(6) requires that the firearm possessed in connection with another felony be connected to the firearm that is the subject of the underlying firearm-possession charge. *Howse*, 478 F.3d at 733 (holding that the application of the enhancement for using a firearm in connection with another felony offense is proper only if there is a clear connection between the firearm that was used in the other offense and the one that was used in the offense of conviction). The record here does not show that the firearm Freeman planned on using to rob the undercover agent was one of the firearms that was stolen from the Arcade. We conclude that because § 2K2.1(b)(6) was not shown to be applicable, Freeman's plan to rob the undercover agent qualifies as a circumstance under § 5K2.0(a)(2)(B) that was not identified by the underlying Guidelines provision.

And even if we assume for the sake of argument that § 2K2.1(b)(6) could in fact cover Freeman's plan to rob the undercover agent, the district court's alleged error in applying § 5K2.0(a)(2)(B) instead of § 2K2.1(b)(6) would be harmless if "we are certain that the error did not affect the district court's selection of the sentence imposed." *United States v. Jeross*, 521 F.3d 562, 569, 573-76 (6th Cir. 2008) (internal quotation

marks omitted) (holding that the district court's use of an incorrect method for calculating the amount of drugs at issue was harmless because "the end result under either method" would have resulted in the court "depart[ing] downward from the Guidelines range and render[ing] a sentence within the statutory maximum" of 240 months' imprisonment, and "[n]othing in the record, moreover, suggests that the district court would have imposed a sentence of less than 240 months").

Nor would the application of § 2K2.1(b)(6) in conjunction with Freeman's § 2K2.1(b)(5) gun-trafficking enhancement raise any double-counting concerns because § 2K2.1(b)(6) (focusing on the possession of a firearm in connection with another felony offense) would apply to a felony offense that is separate from the § 2K2.1(b)(5) trafficking enhancement. *See* U.S.S.G. § 2K2.1 cmt. n. 13(D) (stating that "[i]f the defendant used or transferred one of such firearms in connection with another felony offense (i.e., an offense other than a firearms possession or trafficking offense) an enhancement under subsection (b)(6) also would apply" in addition to the enhancement under subsection (b)(1) based on the number of firearms involved and the enhancement under subsection (b)(5) for trafficking).

Moreover, assuming that § 2K2.1(b)(6) could apply to Freeman's planned robbery of the undercover agent, the four-level enhancement that § 2K2.1(b)(6) would add to Freeman's Guidelines offense level would bring the lower end of Freeman's adjusted Guidelines range *above* the total of 43 months' imprisonment that the court imposed pursuant to § 5K2.0(a)(2)(B). *See Jeross*, 521 F.3d at 573-76 (holding that the district court's error in calculating the amount of drugs at issue was harmless because the error had no impact on the defendant's sentence). We are thus confident that if § 5K2.0(a)(2)(B) did not apply to Freeman's planned robbery of the undercover agent because § 2K2.1(b)(6) applied instead, the district court's error in applying § 5K2.0(a)(2)(B) would have been harmless because the correct application of § 2K2.1(b)(6) would have resulted in a sentence of at least the same length as the 43 months that Freeman received under § 5K2.0(a)(2)(B). *See United States v. Farmer*, 42 F. App'x 804, 808 (6th Cir. 2002) ("Any arguable inadequacy in the district court's

articulation of its reasons for departing upward were, at worst, harmless error, given that specific and appropriate reasons for the departure are evident on the record.").

### 2. *The unusual nature of Freeman's planned robbery*

Freeman also claims that his plan to rob the undercover agent was not unusual or exceptional because involvement in other alleged criminal conduct "in addition to the mere weapons possession . . . in fact is de rigeur for these type[s] of offenses." But, as the government points out, "in the cases upon which Freeman relies, the defendants' advisory guidelines range included an enhancement to reflect the increased danger in unlawfully possessing a firearm in connection with another crime, whereas, in Freeman's case, no aspect of his advisory guidelines range accounted for the risk of harm posed by his planned robbery."

Moreover, Freeman's planned robbery was particularly dangerous and unusual because, as the government explains,

> possessing a firearm in connection with another crime, as a general matter, is one thing (albeit a serious one); but it is quite another (and more serious) to sell firearms to someone immediately before trying to rob the guns back; and it is still another (and yet more serious) where the intended victim of the robbery is an undercover federal agent—especially where the defendant believes his intended victim is an undercover law enforcement official.

We therefore conclude that the district court did not err in imposing a six-month upward departure under U.S.S.G. § 5K2.0(a)(2)(B). And even if we are wrong in our view that U.S.S.G. § 5K2.0(a)(2)(B) applies instead of § 2K2.1(b)(2)(6), the alleged error by the district court was harmless.

**D.      Restitution**

*1.      Appellate waiver*

As the final issue raised on appeal, Freeman argues that his restitution order is overbroad.  He was convicted only for the firearms that were involved in the transactions with the undercover agents, yet the restitution order accounts for all of the firearms that were stolen from the Arcade.  The government responds by arguing that, through his plea agreement, Freeman waived his right to appeal the district court's restitution order.  (Because Freeman "does not deny that his agreement was knowing, voluntary, and intelligent," we do not need to address that issue.  *See United States v. Caruthers*, 458 F.3d 459, 470 n.3 (6th Cir. 2006).)

Freeman's appellate waiver limited his right of appeal to sentences that are above the statutory maximum penalty or that are above the maximum Guidelines range.  The government relies primarily on this court's decision in *United States v. Sharp*, 442 F.3d 946 (6th Cir. 2006), to support its waiver argument.  In *Sharp*, the defendant agreed to an appellate waiver that reserved the very same rights that Freeman reserved here.  Sharp claimed on appeal that the "district court erred in calculating the losses occasioned by his relevant conduct at $49,599.74—the combined amount lost by all victims of the conspiracy—rather than at $17,418.05, the amount that Sharp admits was lost as the result of his direct actions."  *Id.* at 952.

This court in *Sharp* relied on *United States v. Sosebee*, 419 F.3d 451 (6th Cir. 2005), to hold that Sharp had waived his right to make his direct-action claim on appeal because the claim was not included in the narrow reservation of rights in his appellate waiver.  *Sharp*, 442 F.3d at 952 ("Because the restitution statutes do not contain a maximum penalty, Sharp cannot be heard to complain that the restitution order violates the statutory maximum for his offense.").  The court in *Sharp* also held that "[b]ecause there is no applicable Guidelines range for the amount of restitution, the restitution order could not have constituted an upward departure from such a range."  *Id.*

But *Sharp* is distinguishable from the present case because the defendant in *Sharp* pled guilty to the *conspiracy count* that the indictment charged against him. "In calculating restitution, 'the loss caused by the conduct underlying the offense of conviction establishes the outer limits of a restitution order.'" *United States v. Kratt*, 579 F.3d 558, 565 (6th Cir. 2009) (quoting *Hughey v. United States*, 495 U.S. 411, 420 (1990)), *cert. denied*, 130 S. Ct. 2115 (2010). Although the defendant in *Sharp* claimed that only his direct actions, and not the conspiracy as a whole, were the "relevant conduct" for purposes of restitution, the conspiracy was undoubtedly the "offense of conviction" because Sharp was charged with and pled guilty to the conspiracy count. This court in *Sharp* thus dealt only with the narrow situation in which the defendant had waived the right to determine on appeal whether the conspiracy—to which he pled guilty—was part of the "relevant conduct" that could form the basis of a restitution order.

In contrast to Freeman's claims in the present case, the defendant in *Sharp* could not have plausibly contested the fact that his restitution order was based on the conduct underlying the "offense of conviction," i.e., the conspiracy that formed the basis of Sharp's guilty plea. Although *Sharp* also indicates that a defendant signing a similar appellate waiver has waived the right to appeal any facet of the court's restitution order, this broader language was not necessary for the narrower conclusion that Sharp had waived the right to appeal whether the conspiracy count could form the basis of his restitution order. *Sharp*'s overly broad language is thus dicta that does not bind us in the present case. *See United States v. Burroughs*, 5 F.3d 192, 194 (6th Cir. 1993) (holding that "one panel of this court is not bound by dicta in a previously published panel opinion").

As the Tenth Circuit explained in its critique of *Sharp*, the restitution statute "*does* set a statutory maximum on the amount of restitution." *United States v. Gordon*, 480 F.3d 1205, 1210 (10th Cir. 2007) (emphasis in original). This maximum is, absent two exceptions that are not applicable here, "the amount causally linked to the offense of conviction." *Id.* Because the parties in *Gordon* "only intended that Ms. Gordon

would waive the right to appeal aspects of her sentence and restitution that were imposed within the authority granted to the district court by the relevant statutes," the Tenth Circuit held that Ms. Gordon had not waived her right to appeal "the restitution order to the extent it requires payments for losses not causally linked to the count of conviction" for credit card fraud. *Id.* at 1207, 1209.

The most natural reading of the plea waiver at issue in the present case also supports the conclusion that Freeman did not waive all possible objections to his restitution order. A defendant's ability to appeal sentences above the statutory maximum allows the defendant to object to sentences that plainly have no basis in law. In fact, even where a defendant does not reserve the right to appeal a sentence that exceeds the statutory maximum, "an appellate waiver may not bar an appeal asserting that the sentence exceeds the statutory maximum" because "a defendant who waives his right to appeal does not subject himself to being sentenced entirely at the whim of the district court." *United States v. Caruthers*, 458 F.3d 459, 471–72 (6th Cir. 2006) (internal quotation marks omitted). Just as defendants are not at a district court's whim regarding their terms of imprisonment, they must also be able to appeal restitution orders that have no basis in law. *See id.* (suggesting that the "district court is without jurisdiction to impose a sentence exceeding the statutory maximum," and that denying defendants the ability to appeal sentences above the statutory maximum would constitute a miscarriage of justice). In the present case, Freeman explicitly reserved the right to appeal sentences above the statutory maximum. We believe that this reservation includes the right to appeal a restitution order that is not based on conduct underlying the offense of conviction.

Moreover, "[p]lea agreements are contractual in nature, so we use traditional contract law principles in interpreting and enforcing them." *United States v. Bowman*, — F.3d —, 2011 WL 350296, at *3 (6th Cir. Feb. 7, 2011) (published opinion) (internal quotation marks omitted). "But because plea agreements' constitutional and supervisory implications raise concerns over and above those present in the traditional contract context, in interpreting such agreements we hold the government to a greater degree of

responsibility than the defendant . . . for imprecisions or ambiguities in the plea agreements." *Id.* (alteration in original) (internal quotation marks omitted).

"Ambiguities in a plea agreement are therefore construed against the government, especially because the government can take steps in drafting a plea agreement to avoid imprecision." *Id.* (citing *United States v. Fitch*, 282 F.3d 364, 367–68 (6th Cir. 2002)); *see also Gordon*, 480 F.3d at 1209–10 (holding that, as a matter of contract interpretation, a "plea agreement permitting a court to impose a restitution order beyond that authorized by statute might well be unenforceable on grounds of public policy," and that the defendant is "entitled to presume, when she entered the plea agreement, that the judge would order restitution in a legal manner"). We therefore hold that Freeman did not waive the right to appeal whether the district court exceeded its statutory authority by imposing a restitution order that was based on losses exceeding those caused by the conduct underlying the offense of conviction.

### 2.     *Offense of conviction*

Freeman argues that because restitution is limited to "the loss caused by the conduct underyling the offense of conviction," restitution in the present case should be limited to covering the value of the 12 firearms that are listed in his indictment. Where a defendant is "convicted pursuant to a guilty plea rather than by a jury, the court should look to the plea agreement, the plea colloquy, and other statements made by the parties to determine the scope of the 'offense of conviction' for purposes of restitution." *United States v. Elson*, 577 F.3d 713, 723 (6th Cir. 2009). Freeman's plea information is less than clear regarding which acts "the parties intended to include" as "supporting his conviction." *See id.* at 723–24. On the one hand, the plea agreement states that Freeman would plead guilty to Count 1 of his indictment and that the charges brought against him would be limited to "one count of 18 U.S.C. § 992(j), as set forth in the Indictment." The district court at Freeman's plea colloquy also specified that Freeman was pleading guilty to Count 1 of the indictment and that he is "basically in the same boat as if [he had] been convicted by a jury" on Count 1. Moreover, the only reference in Freeman's plea agreement to restitution is the statement in the first paragraph that Count 1 of

Freeman's indictment subjects him to restitution. And Count 1 of Freeman's indictment mentions only the 12 firearms that were associated with the undercover agents, and makes no mention of any of the other firearms that were stolen from the Arcade. This information thus suggests that Freeman's plea is limited to his and Roehm's interactions with the undercover agents.

On the other hand, the statement of facts in Freeman's plea agreement notes that he was involved in the disposal of approximately 34 firearms that were stolen from the Arcade. (This statement also mentions that Freeman offered to sell additional firearms to one of the agents, but does not specify whether Freeman actually possessed these additional weapons.) But even this statement of facts goes into detail regarding only the firearms that were involved in Freeman's and Roehm's interactions with the undercover agents.

Taken as a whole, the plea agreement and colloquy tend to cabin the acts underlying the offense of conviction to those related to the interactions with the undercover agents. From the government's point of view, this information is at best ambiguous as to whether the theft of all of the firearms should be considered relevant as well. But ambiguous plea agreements are to be construed in favor of the defendant. *Bowman*, 2011 WL 350296, at *3. Freeman's plea information therefore requires limiting his conduct underyling the offense of conviction to Freeman's possession of the 12 firearms related to his and Roehm's dealings with the undercover agents.

The district court's restitution order that was based on the burglary of all of the firearms from the Arcade must therefore be reversed. On remand, the district court should determine the proper amount of restitution based on only the 12 firearms involved in Count 1 of the indictment, minus the value of any of the firearms that are recovered. We note in this regard that the PSR took the position that Freeman should not owe any restitution because "all of the stolen firearms mentioned in the indictment were recovered." Whether that position is correct is for the district court to decide in the first instance.

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the term of imprisonment imposed by the district court, but **REVERSE** the court's restitution order and **REMAND** the case for further consideration regarding the issue of restitution.