RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0216p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

SCOTT O. CALLAHAN,

*Plaintiff-Appellant*,

*v.*

No. 19-5210

FEDERAL BUREAU OF PRISONS; STEVEN GARCIA,
individually; FRANCISCO J. QUINTANA, individually,

*Defendants-Appellees*.

─────────────

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 5:18-cv-00389—Joseph M. Hood, District Judge.

Decided and Filed: July 16, 2020

Before: MOORE, SUTTON, and GRIFFIN, Circuit Judges.

─────────────

## COUNSEL

**ON BRIEF:** Charles P. Wisdom, Jr., Cheryl D. Morgan, UNITED STATES ATTORNEY'S
OFFICE, Lexington, Kentucky, for Appellee. Scott O. Callahan, Lexington, Kentucky, pro se.

SUTTON, J., delivered the opinion of the court in which GRIFFIN, J., joined. MOORE,
J. (pp. 8–19), delivered a separate dissenting opinion.

─────────────

## OPINION

─────────────

SUTTON, Circuit Judge. Federal prison officials seized one of Scott Callahan's
paintings and some mail-order photos on the ground that they violated the prison's rules against
possessing sexually explicit materials. After filing internal grievances without success, Callahan

turned to federal court to seek money damages and other relief under the First Amendment's right to freedom of speech. The district court declined to create an implied cause of action, often called a *Bivens* claim, under the First Amendment for Callahan's claim. We affirm.

Callahan has spent the past nine or so years in a federal prison after pleading guilty to child pornography charges. In prison, he took up painting and art history. He describes himself as a "fairly[] highly trained artist" and says his work is in demand. R. 1 at 3.

He tends to "paint pictures of women, mostly clad in bikinis," sometimes topless, sometimes wearing more clothing. R. 23-1 at 4–5. Some of the women in his paintings are "rendered sensuously," as Callahan acknowledges. R. 23-1 at 26. Prison administrators, including Steven Garcia (the recreation supervisor) and Francisco Quintana (the warden), have seized Callahan's paintings in the past when they went too far.

In this pro se lawsuit under the First Amendment against the Bureau of Prisons, Garcia, and Quintana, Callahan complains about their seizure of a painting in June 2017. The painting depicts a reclining, bikini-clad woman with exaggerated breasts. He also complains that the prison seized mail-order photos of "pretty women posing for pictures." R. 1 at 7–8. Before filing the lawsuit, he sought, and failed to obtain, relief through the prison grievance system. Callahan seeks $100,000 in compensatory damages, additional punitive damages, and declaratory and injunctive relief.

The district court dismissed the damages claim because Callahan lacked a cause of action against the Bureau of Prisons and prison officials. The court granted the defendants' motion for summary judgment on the other claims because Callahan did not raise a triable issue over whether the defendants violated his rights. This appeal followed.

Between 1971 and 1980 in a trio of decisions, the Supreme Court recognized an implied cause of action by individuals who sued federal officers for violations of their constitutional rights. *Carlson v. Green*, 446 U.S. 14 (1980); *Davis v. Passman*, 442 U.S. 228 (1979); *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971). The Court reasoned that sometimes individual-rights violations could be redressed only by damages, and it had the power to create such actions unless Congress limited them. *Bivens*, 403 U.S. at 397.

Subsequent developments leave Callahan with a forbidding hill to climb.  What started out as a presumption in favor of implied rights of action has become a firm presumption against them.  The Supreme Court has not recognized a new *Bivens* action in the 40 years since *Carlson*.  And it has repeatedly declined invitations, many just like Callahan's, to create such actions.  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017) (collecting eight examples).  Over the same period of time, it has renounced the method of *Bivens*, *Davis*, and *Carlson*.  When asked "who should decide" whether a cause of action exists for violations of the Constitution, "[t]he answer most often will be Congress."  *Id.*  The Court has not just rejected the *Bivens* inclination that a private right of action exists when Congress is silent; it has adopted the opposite approach in statutory and constitutional cases.  *See Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001).

The Court's actions over the last four decades match its words.  Most telling of all, it has rejected extensions of *Bivens* to claims that involve constitutional rights that *Bivens* already reaches.  *Carlson*, for example, authorized a *Bivens* action for an Eighth Amendment claim of deliberate indifference to an inmate's medical needs.  446 U.S. at 16–18.  But *Minneci v. Pollard* rejected a deliberate-indifference claim in the context of a privately operated prison, even if the Eighth Amendment otherwise applied there.  565 U.S. 118, 121, 131 (2012).  *Bivens* itself involved a Fourth Amendment seizure.  403 U.S. at 389–90.  But just five months ago, *Hernandez v. Mesa* rejected an invitation to innovate a similar remedy for a Fourth Amendment claim arising from a cross-border shooting.  140 S. Ct. 735, 744, 750 (2020).

The problem for Callahan is not just that there has been a long drought since the Court last recognized a new *Bivens* action or even that the Court has cut back on the three constitutional claims once covered.  What's harder still is that the Court has never recognized a *Bivens* action for any First Amendment right, *Reichle v. Howards*, 566 U.S. 658, 663 n.4 (2012), and it rejected a First Amendment retaliation claim decades ago for federal employees, *Bush v. Lucas*, 462 U.S. 367, 368 (1983).  There's something to be said for leaving it at that and pointing out that the best idea for people in Callahan's situation is to urge Congress to create a cause of action for constitutional claims against federal officials like the one used against state officials.  *See* 42 U.S.C. § 1983.

But even if we look at the court-created criteria for ascertaining whether a *Bivens* claim exists, they do not help Callahan. One consideration is whether the proposed claim differs "in a meaningful way from previous *Bivens* cases decided by th[e] Court." *Abbasi*, 137 S. Ct. at 1859. As just shown, that does not help Callahan because his First Amendment claim arises in a context the Supreme Court has never countenanced before—and indeed once rejected.

Another consideration is whether "special factors counsel[] hesitation" in recognizing the new claim. *Id.* Those factors include whether existing legislation covers the area and whether alternative processes exist for protecting the right. *Id.* at 1858, 1862. We also consider separation-of-powers principles, including the risk of interfering with the authority of the other branches and whether the judiciary can competently weigh the costs and benefits at stake. *Hernandez*, 140 S. Ct. at 743.

These considerations do not help Callahan either. "[L]egislative action suggesting that Congress does not want a damages remedy" counsels against judicial do-it-yourself projects. *Abbasi*, 137 S. Ct. at 1865. Congress paid close attention to inmate constitutional claims when it enacted the Prison Litigation Reform Act of 1995. 42 U.S.C. § 1997e. The Act "does not provide for a standalone damages remedy against federal jailers." *Abbasi*, 137 S. Ct. at 1865. That suggests a considered decision not to extend a damages remedy to First Amendment violations. *Id.*

In addition, "when alternative methods of relief are available, a *Bivens* remedy usually is not." *Id.* at 1863. Alternative processes, for *Bivens* purposes, do not have to be creations of Congress. *Minneci*, 565 U.S. at 126–31. Nor must a sufficient scheme be "perfectly congruent" with a *Bivens* remedy or "provide complete relief" for the alleged violation. *Id.* at 129 (quotation omitted). The federal prisons' grievance process provides an alternative path for Callahan to air his claims. 28 C.F.R. § 542.10 *et seq.* The process is substantial; it contains its own statutes of limitations, filing procedures, and appeals process. *Id.* §§ 542.13–15. And prisoners may retain attorneys for assistance with the process. *Id.* § 542.16. That resembles the many cases in which the Court has pointed to existing schemes providing relief to injured parties and deterrence to constitutional violations. *See Abbasi*, 137 S. Ct. at 1863 (collecting cases).

Prison-based claims also present a risk of interference with prison administration. "Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources." *Turner v. Safley*, 482 U.S. 78, 84–85 (1987). Those tasks fall "peculiarly within the province of the legislative and executive branches." *Id.* at 85. Given the array of challenges facing prison administration and the complexity of those problems, "separation of powers concerns counsel a policy of judicial restraint," *id.*—counsel in favor in other words of the judiciary not creating new causes of action in this area. That First Amendment claims have less purchase in prisons for some of these same reasons, *see id.*, would make it especially puzzling to recognize a *Bivens* First Amendment claim for federal inmates but not for federal employees. *See Bush*, 462 U.S. at 368.

Callahan's claims bring these considerations into focus. He is in prison based on serious child pornography convictions. His lawsuit challenges the prison's determination that his painting project and pictures were sexually explicit enough to increase risks of harassment of female personnel and disorder among prisoners. *See Mauro v. Arpaio*, 188 F.3d 1054, 1059 (9th Cir. 1999). Defining similar concepts has bedeviled the courts. *Cf. Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring). We ought to hesitate before volunteering the judiciary to extend deep enough into everyday federal prison administration to apply those standards to endless variations of racy and provocative images, decide the threshold for acceptable risk to personnel or inmate safety, evaluate whether a particular piece of mail crosses that threshold, and determine what kind of compensatory and punitive damages are available for such claims—all without input from the legislative or executive branches.

Taken together, these considerations offer plenty of reasons to "hesitate" about extending *Bivens* to Callahan's claims. *Abbasi*, 137 S. Ct. at 1858. And that is enough to decline to recognize a new *Bivens* action for free speech claims in prisons.

While Callahan does not raise the point, it's true that we once allowed a prisoner to seek damages from officials who opened his legal mail. *Merriweather v. Zamora*, 569 F.3d 307, 310 (6th Cir. 2009). But the opinion assumed that *Bivens* applied without analyzing the issue, and Callahan at any rate does not claim that the pictures amount to legal mail.

Also true is the reality that our court has questioned the prison grievance system's adequacy as a *Bivens* alternative. *Koprowski v. Baker*, 822 F.3d 248, 256–57 (6th Cir. 2016). But the brief discussion observed only that the grievance system's existence did not suffice to reject a *Bivens* claim already in existence. *Id.* We said nothing about its relevance to the creation of a *new Bivens* claim. *Id.*

Callahan submits that in reality his claim is a Fourth Amendment seizure claim and thus within *Bivens*' orbit. Even if Callahan had not forfeited that argument by failing to present it to the district court, it would not help him. "A claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." *Hernandez*, 140 S. Ct. at 743. Callahan's purported Fourth Amendment claim differs materially from *Bivens* and thus amounts to a new context. Callahan is an incarcerated prisoner, while Bivens was not; Callahan names prison administrators as defendants, while *Bivens* involved law enforcement agents; Callahan objects to seizure of his property, while Bivens objected to seizure of his person. These amount to substantial differences. But even if they weren't, "a modest extension is still an extension." *Abbasi*, 137 S. Ct. at 1864; *see also Hernandez*, 140 S. Ct. at 743–44. The same considerations, already mentioned, disfavor any such extension. All in all, the district court correctly concluded that Callahan lacked a cause of action to complain of the confiscation of his painting and pictures.

Callahan hasn't identified any circuit courts that recognize a *Bivens* action in this setting. And we are unaware of any circuits that have done so. To the contrary, at least two have rejected prison First Amendment claims like this one. *Bistrian v. Levi*, 912 F.3d 79, 95–96 (3d Cir. 2018); *Vega v. United States*, 881 F.3d 1146, 1153–55 (9th Cir. 2018).

Our analysis up to this point has not differentiated among the forms of relief Callahan requests: compensatory damages, punitive damages, an injunction, and declaratory relief. Because Callahan has not given us a good reason to distinguish between the forms of relief he requests, we see no need to address his separate claims for equitable relief now that it is clear he lacks a cause of action. Even so, it's worth adding that, as the district court noted, it seems unlikely that Callahan could meet *Turner v. Safley*'s imposing standard for bringing a successful First Amendment claim in prison. 482 U.S. at 89. The dissent objects that, in light of this last

sentence, we do not need to reach the private-right-of-action claim. Suffice to say that our decision merely resolves the "antecedent" question first. *Hernandez v. Mesa*, 137 S. Ct. 2003, 2006 (2017); *Wood v. Moss*, 572 U.S. 744, 757 (2014); *see also Hernandez*, 140 S. Ct. at 741; *Abbasi*, 137 S. Ct. at 1854 (treating *Bivens* as "[t]he first question"); *Minneci*, 565 U.S. at 126; *Wilkie v. Robbins*, 551 U.S. 537, 549 (2007); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001).

We affirm.

———————————

**DISSENT**

———————————

KAREN NELSON MOORE, Circuit Judge, dissenting. The majority engages in some fancy footwork to distract from the fact that it unnecessarily decides one issue while ignoring another issue that we must decide to resolve this appeal. The majority first concludes that there is no implied private right of action for Plaintiff-Appellant Scott Callahan's First Amendment claims for monetary relief pursuant to *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971). But there is no need to reach this question under the majority's reasoning because "it seems unlikely," according to the majority, that Callahan would prevail on the merits of his First Amendment claims under *Turner v. Safley*, 482 U.S. 78 (1987). Majority Op. at 6. The majority brushes away Callahan's claims seeking equitable relief, stating that "[b]ecause Callahan has not given us a good reason to distinguish between the forms of relief he requests, we see no need to address his separate claims for equitable relief now that it is clear he lacks a cause of action." *Id.* Yet *Bivens* is inapplicable to claims seeking equitable relief. The majority opinion thus does not resolve the appeal. Instead, it conflates Callahan's claims and seizes upon the opportunity to rule out *Bivens* relief in this context, camouflaging its analysis as a holding. I would reverse the district court because Callahan satisfies *Turner* in his as-applied First Amendment challenge and a *Bivens* cause of action exists for his First Amendment claims that seek monetary damages.

## I. The majority's *Bivens* analysis is neither binding nor dispositive

Dicta is defined as "[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential." *Richmond Health Facilities-Kenwood, LP v. Nichols*, 811 F.3d 192, 201 n.8 (6th Cir. 2016) (quoting *Obiter dictum*, Black's Law Dictionary (10th ed. 2014)); *see also Logan v. MGM Grand Detroit Casino*, 939 F.3d 824, 836 (6th Cir. 2019). In other words, "[i]f the court's judgment and the reasoning which supports it would remain unchanged, regardless of the proposition in question, that proposition plays no role in explaining why the judgment goes for the winner." Pierre N. Leval,

*Judging under the Constitution: Dicta about Dicta*, 81 N.Y.U. L. Rev. 1249, 1256 (2006). Dicta may include overbroad statements, *see, e.g.*, *United States v. Freeman*, 640 F.3d 180, 193 (6th Cir. 2011), up to an analysis of an entire issue, verging on an advisory opinion, *see, e.g.*, *Spears v. Stewart*, 283 F.3d 992, 999 (9th Cir. 2002).

The majority's opinion falls under the latter category. Taking at face value the majority's assertion that Callahan would fail to satisfy *Turner*, the majority's *Bivens* analysis is superfluous. Though whether *Bivens* relief is available is an "antecedent" question to whether a constitutional violation occurred, we are not required to answer it first. *Hernandez v. Mesa*, 137 S. Ct. 2003, 2006–07 (2017) (*Hernandez I*). "[I]n many cases," it "is appropriate" *not* to decide the *Bivens* question, but to "resolv[e] the constitutional question, while assuming the existence of a *Bivens* remedy." *Id.* at 2007. Given the majority's conclusion that Callahan would not satisfy *Turner*, its *Bivens* analysis is unnecessary. Put differently, the result of the majority opinion is the same, without or without the *Bivens* analysis. And considering the Supreme Court's consistent approach to "assume[ ] without deciding that *Bivens* extends to First Amendment claims," *Wood v. Moss*, 572 U.S. 744, 757 (2014), it is also inappropriate to decide the *Bivens* issue when the majority concludes that Callahan cannot demonstrate a First Amendment violation.

Moreover, the *Bivens* analysis is not dispositive of Callahan's non-*Bivens* claims, *i.e.* those for equitable relief. In *Bivens*, the Court decided "whether violation of [the Fourth Amendment] by a federal agent acting under color of his authority gives rise to a cause of action *for damages consequent upon his unconstitutional conduct*. Today we hold that it does." *Bivens*, 403 U.S. at 389 (emphasis added); *see also Ziglar v. Abbasi*, 137 S Ct. 1843, 1854 (2017); *Left Fork Min. Co. v. Hooker*, 775 F.3d 768, 770 (6th Cir. 2014). Thus, by definition, *Bivens* actions seek monetary damages. Frequently, courts characterize *Bivens* actions as claims where "it is damages or nothing." *Bivens*, 403 U.S. at 410 (Harlan, J., concurring in judgment). Separate and apart from *Bivens*, a federal prisoner who has exhausted his grievance with the Bureau of Prisons' ("BOP") Administrative Remedy Program ("ARP") "may file suit in federal court seeking injunctive relief." *Koprowski v. Baker*, 822 F.3d 248, 256 (6th Cir. 2016) (citing *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001)); *see also Carlson v. Green*, 446 U.S. 14, 42 (1980) (Rehnquist, J., dissenting) (noting that "federal courts have historically had broad

authority to fashion equitable remedies"); *Bivens*, 403 U.S. at 400 (Harlan, J., concurring in judgment) (stating that the "availability of federal equitable relief" is "presumed"). Therefore, the majority's *Bivens* analysis fails to resolve Callahan's appeal regarding his claims seeking equitable relief.

The majority cannot escape addressing *Turner* in this appeal. On the one hand, if the majority believes that Callahan fails to satisfy *Turner* for his claims for declaratory and equitable relief, then there is no need to decide the *Bivens* question for his claims seeking monetary damages. The adverse *Turner* determination would resolve Callahan's entire appeal, and the majority's comments regarding *Bivens* are necessarily dicta. On the other hand, if the majority were to conclude that Callahan satisfies *Turner*, then the majority must allow Callahan's claims for equitable relief to proceed, and the majority could not simply affirm in full the district court because the district court concluded that Callahan did not satisfy *Turner* for his equitable claims. *See Callahan v. Quintana*, No. 18-389-JMH, 2019 WL 653803, at *3–5 (E.D. Ky. Feb. 14, 2019). This demonstrates that *Turner*, then, is the dispositive issue and that the majority's *Bivens* exploration is mere dicta.

## II. Under *Turner*, Callahan demonstrates that material fact disputes exist as to his as-applied First Amendment challenge

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner*, 482 U.S. at 84. Therefore, "federal courts must take cognizance of the valid constitutional claims of prison inmates" under the First Amendment. *Id.* However, an inmate's rights are "subject to legitimate penological interests," *Sheets v. Moore*, 97 F.3d 164, 166 (6th Cir. 1996) (citing cases), meaning "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system," *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Thus, "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large." *Shaw v. Murphy*, 532 U.S. 223, 229 (2001). Generally, we "defer to the expertise of prison officials in matters involving prison administration." *Flagner v. Wilkinson*, 241 F.3d 475, 483 (6th Cir. 2001). To strike the appropriate balance between an inmate's constitutional rights and legitimate penological objectives, "'the proper

inquiry is whether the actions of the prison officials are reasonably related to legitimate penological interests'" when the challenge is "to a prison policy as applied." *Id.* (quoting *Skelton v. Pri-Cor, Inc.*, 963 F.2d 100, 103 (6th Cir. 1991)).

To determine whether a prison regulation as applied is reasonably related to legitimate penological interests, we apply the four-factor test from *Turner*. *Id.* "First, there must be a 'valid, rational connection' between the prison regulation," or here, the officials' application of the regulation, "and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89. "[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Id.* at 89–90. The last three factors are "balanced together." *Flagner*, 241 F.3d at 484. The second factor "is whether there are alternative means of exercising the right that remain open to prison inmates"; the third "is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and the fourth is "the absence of ready alternatives." *Turner*, 482 U.S. at 90 (citations omitted).

It is longstanding, established precedent in this circuit that we apply the four-factor *Turner* analysis in an as-applied challenge by focusing on the prisoner's personal circumstances. *Flagner*, 241 F.3d at 483–84 n.5. The question is whether the defendants' application of the regulations to Callahan was reasonably related to a legitimate penological interest. *See Figel v. Overton*, 121 F. App'x 642, 646 (6th Cir. 2005).[1] Callahan raises an as-applied, rather than a facial, challenge to the prison regulations. *See, e.g.*, R. 1 (Compl. at ¶ 16) (Page ID #3) ("Callahan does not draw or paint anything even similar to pornography and he, in no way, violates the BOP policies and regulations cited above."); *id.* at ¶ 51 (Page ID #8) ("As with the painting, the pictures being sent, in no way, violate policy."). Therefore, each *Turner* factor must be addressed by focusing on the application to Callahan of the local supplement,[2] under

---

[1]In *Hanrahan v. Mohr*, the panel stated that under the first *Turner* factor, "the issue is not whether the prohibited materials have in fact caused problems or are even 'likely' to cause problems, but whether a reasonable official might think that the policy advances these interests." 905 F.3d 947, 958 (6th Cir. 2018) (quoting *Thompson v. Campbell*, 81 F. App'x 563, 567 (6th Cir. 2003)). As we have held before, this misreads *Thornburgh v. Abbott*, 490 U.S. 401 (1989). *Flagner*, 241 F.3d at 483–84 n.5.

[2]Subdivision "6.e." of the local supplement provides:

which Callahan's painting was confiscated, and the BOP Program Statement 5265.14,[3] which prohibits prisoners from receiving sexually suggestive photos via mail.[4]

Under the first factor, the government objective must be "legitimate and neutral," and the officials' application of the regulation must be "rationally related" to the objective. *Thornburgh v. Abbott*, 490 U.S. 401, 414 (1989). A regulation is neutral if the regulation "further[s] an important or substantial governmental interest unrelated to the suppression of expression." *Id.* at 415 (quoting *Procunier v. Martinez*, 416 U.S. 396, 413 (1974)). Thus, when prison officials "draw distinctions between [materials] solely on the basis of their potential implications for prison security," or any other neutral, legitimate interest, "the regulations are 'neutral' in the technical sense in which we meant and used that term in *Turner*." *Id.* at 415–16. In an as-applied challenge, neutral and legitimate objectives are not rationally related to the application of the regulations if the plaintiff is able to demonstrate the "lack of factual basis for [the prison's] justifications as applied to himself." *Flagner*, 241 F.3d at 486.

The defendants argue that the safety and security of the facility and the rehabilitation of prisoners are legitimate objectives. Appellee Br. at 16–17. They are generally correct. *See Turner*, 482 U.S. at 91–92 (safety and security); *Pell*, 417 U.S. at 823 (rehabilitation). However,

---

Inmates participating in Recreation Hobby Craft programs . . . are prohibited, based on inappropriate inmate sexual behavior. This includes all sexual drawings, paintings, writings, sculptures, and other depictions. Such as depicting genitalia, exposed breasts, sexual acts, caricatures emphasizing sexual body parts, which fall under the obscenity law. If they are shown to lack serious scientific, literary, artistic, or political value, items are not permitted in any way and inmate subject to disciplinary guidelines.

R. 19-2 (Local Supplement at 11) (Page ID #117).

[3]Program Statement 5265.14 provides:

Nude or sexually suggestive photos (individual prints or copies as opposed to those from publications) present a special concern for personal safety, security, and good order. . . . [O]rdinarily an inmate is not permitted to receive through the mail a personal photograph in which the subject is nude, displays genitalia or female breasts, or when the photo depicts sexual suggestive acts such as intercourse, fellatio, or sodomy.

The exclusion of this or similar materials is determined by whether it would be detrimental to an individual's safety or security, or to institution good order, if it were in the inmate's possession. . . .

Federal Bureau of Prisons, Program Statement 5265.14, at 10 (Apr. 5, 2011), https://www.bop.gov/policy/progstat/5265_014.pdf.

[4]We have not addressed the facial validity of the local supplement, Program Statement 5265.14, or the regulations that they interpret.

material issues of fact exist as to whether the regulations *as applied to Callahan* were rationally connected to these objectives.

First, Callahan disputes whether his painting and the photographs actually ran afoul of the regulations. *See, e.g.*, Appellant Br. 27. Callahan states in his declaration that other FMC employees, specifically an officer named McAllister, believed that his painting did not violate any polices. R. 23-1 (Callahan Decl. at 4–5) (Page ID #198–99).[5] He also provides magazine photos that inmates allegedly are allowed to possess, and these images are similar to the mail-order photographs. *See* R. 23-1 (Photos at 1–10) (Page ID #253–62). The subjects in these photos are in equally suggestive poses and are also clothed only in undergarments. *See id.* The defendants do not offer any explanation for this discrepancy in the application of the regulations and policies, nor do they dispute that inmates may possess such magazine photos. In other First Amendment cases in the prison context, we have concluded that the uneven application of a policy, one that is "arbitrary and capricious," "violate[s] a prisoner's First Amendment rights." *Sallier v. Brooks*, 343 F.3d 868, 873–74 (6th Cir. 2003). Thus, Callahan makes a showing that the policy as applied to him is not rationally connected to a legitimate objective.

The dueling declarations in the record, *i.e.* Callahan's and those of Francisco J. Quintana and Steven Garcia, the Warden and Supervisor of Recreation at the Federal Medical Center in Lexington, Kentucky, respectively, further demonstrate a dispute as to whether legitimate penological objectives were served by applying the regulations to Callahan. For instance, Garcia declared that sexually explicit materials have been used to decorate inmates' cells and that this constitutes a hostile work environment for female staff—and has even led to the harassment of female staff members. R. 19-2 (Garcia Decl. at 3) (Page ID #102). But in his declaration, Callahan stated that inmates do not in fact display such materials, which we may reasonably infer includes himself. R. 23-1 (Callahan Decl. at 3) (Page ID #197); *see also* R. 1 (Compl. at ¶ 36) (Page ID #7) (alleging that the painting was not on display when it was confiscated). And though Garcia alleged that Callahan once inappropriately painted a female staff member, R. 19-2 (Garcia Decl. at 3) (Page ID #102), Callahan disputes this particular incident, R. 23-1 (Callahan

---

[5]Callahan's declaration complies with 28 U.S.C. § 1746. *See* R. 23-1 (Callahan Decl. at 10) (Page ID #204).

Decl. at 9–10) (Page ID #203–04).  Quintana declared that in his experience at the FMC, materials of this sort had led to theft and violence from failed attempts to barter with those materials.  R. 19-4 (Quintana Decl. at 2) (Page ID #143).  Yet again, Callahan, in his declaration, stated that he has never used his paintings or photos to barter with other inmates.  R. 23-1 (Callahan Decl. at 3) (Page ID #197).  Finally, the defendants point to Quintana's declaration in which he stated that such pictures have no rehabilitative purpose, *id.* at 3 (Page ID #144), but nothing in the record specifically shows that Callahan's possession of these materials had no rehabilitative purpose.

Despite the fact that both parties moved for summary judgment, the record shows material fact disputes exist as to the first *Turner* factor.  Because a genuine issue of fact exists as to whether "the policies at issue fail under the first *Turner* factor," the *Turner* analysis ends here. *Am. Civil Liberties Union Fund of Mich. v. Livingston County*, 796 F.3d 636, 648 (6th Cir. 2015) (quoting *Muhammad v. Pitcher*, 35 F.3d 1081, 1084 (6th Cir. 1994)).  Given the clear precedent set forth in *Flagner* regarding how we analyze as-applied challenges, the district court abused its discretion in granting summary judgment in favor of defendants at this early stage.  *Entm't Prods., Inc. v. Shelby County*, 588 F.3d 372, 377 (6th Cir. 2009) (applying abuse-of-discretion review to a district court's denial of equitable relief).

Because material issues of fact exist as to the first *Turner* factor, we should at a minimum reverse the district court as to its grant of summary judgment to the defendants on Callahan's First Amendment claims seeking equitable and declaratory relief.  The above analysis allows Callahan to move forward on his claims for monetary damages relief insofar as he has a remedy under *Bivens*.  Thus, I proceed to determine whether a *Bivens* action is available to Callahan regarding his claims for monetary damages.

### III.  A *Bivens* remedy for damages exists in this context

In *Bivens*, "the Supreme Court recognized a limited, implied cause of action against federal employees for" Fourth Amendment violations.  *Left Fork*, 775 F.3d at 774.  The Court did so while acknowledging that in the absence of "a judicially-created damages remedy," the plaintiff "would otherwise be without *any* remedy for an unconstitutional invasion of his rights

by federal agents." *Id.* (citing *Bivens*, 403 U.S. at 390). Since *Bivens*, "the Court also recognized 'an implied damages remedy under the Due Process Clause of the Fifth Amendment, and the Cruel and Unusual Punishments Clause of the Eighth Amendment,'" though "the Supreme Court has 'consistently refused to extend *Bivens* liability to any new context or new category of defendants.'" *Haines v. Fed. Motor Carrier Safety Admin.*, 814 F.3d 417, 431 (6th Cir. 2016) (citations omitted). In *Ziglar v. Abbasi*, the Supreme Court specified that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity." 137 S. Ct. at 1857. But whether a *Bivens* remedy is available for First Amendment claims is an open question. *See Wood*, 572 U.S. at 757 (explaining that the Court has "several times assumed without deciding that *Bivens* extends to First Amendment claims"). We have previously recognized *Bivens* remedies for First Amendment claims in the employment context, *see Braun v. United States*, 707 F.2d 922, 925 (6th Cir. 1983), and in the prison context when federal officers have opened legal mail, *see Merriweather v. Zamora*, 569 F.3d 307, 310 (6th Cir. 2009).

A *Bivens* analysis has two parts. First, courts address whether a *Bivens* remedy may be implied. *Hernandez I*, 137 S. Ct. at 2006. To do so, we ask if the claim "arises in a 'new context' or involves a 'new category of defendants.'" *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020) (*Hernandez II*) (quoting *Malesko*, 534 U.S. at 68). Because neither this court nor the Supreme Court has concluded that *Bivens* actions are available for First Amendment free-speech or freedom-of-expression claims arising in the prison context, Callahan seeks an extension of *Bivens*.

Second, courts determine if it is appropriate to extend a *Bivens* cause of action to the new context. "A *Bivens* remedy is available only if (1) there are no 'alternative, existing process[es]' for protecting a constitutional interest and, (2) even in the absence of an alternative, there are no 'special factors counselling hesitation before authorizing a new kind of federal litigation.'" *Left Fork*, 775 F.3d at 774 (quoting *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007)). Under a special-factors analysis, the Court has examined "the risk of interfering with the authority of the other branches," asking "whether 'there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy,' and 'whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a

damages action to proceed.'"  *Hernandez II*, 140 S. Ct. at 743 (quoting *Abbasi*, 137 S. Ct. at 1858).  Such action is warranted here because there are no alternative remedies for Callahan's claims nor any special factors counseling hesitation.

First, we consider alternative, existing processes.  When "Congress has provided an alternative remedy which it explicitly declared to be a *substitute* for recovery directly under the Constitution" and that remedy is "viewed as equally effective," we do not infer a *Bivens* remedy.  *Carlson*, 446 U.S. at 18–19.  Importantly, "separation-of-powers principles" drive a *Bivens* analysis, meaning that we defer to Congress's decision to recognize—or not to recognize—a private cause of action.  *Abbasi*, 137 S. Ct. at 1856; *Hernandez II*, 140 S. Ct. at 741–43.  Here, Congress has not created an alternative remedy, nor has it expressly provided, in statutory text or legislative history, that a *Bivens* remedy is precluded.  *See Koprowski*, 822 F.3d at 252.

The defendants argue that the ARP is a sufficient alternative process, Appellee Br. at 8, but the defendants, like the majority, conspicuously neglect to address the fact that the ARP is not Congress's design, but the BOP's.  As set forth above, the touchstone for a *Bivens* analysis is "statutory intent," *i.e.* congressional intent.  *Abbasi*, 137 S. Ct. at 1855.  Therefore, there must be at least some clue that Congress intended that the ARP serve as a federal inmate's remedy for free-speech and freedom-of-expression claims against federal officers.  In *Malesko*, the Court favorably considered the ARP process, but it did so only after concluding that the Federal Tort Claims Act, clearly a manifestation of congressional intent, provided an avenue for prisoners to seek damages.  *See* 534 U.S. at 68, 72–73.  Indeed, we have declined to conclude that we are precluded from continuing to recognize a *Bivens* remedy in the Eighth Amendment context based only on the ARP's existence.  *See Koprowski*, 822 F.3d at 252–57.

The unavailability of monetary damages also demonstrates that the ARP is an inadequate alternative process.  Though the ARP allows prisoners like Callahan to air their constitutional grievances and provides injunctive relief, it fails to provide money damages.  *See Malesko*, 534 U.S. at 74.  In *Koprowski*, we declined to count the ARP as a sufficient alternative process because the ARP lacks a damages remedy, noting that the existence of the ARP alone had not affected either the Supreme Court's nor three circuit courts' decisions to maintain an Eighth Amendment *Bivens* remedy in the prison context for over four decades.  822 F.3d at 256–57.

Callahan's claim as it addresses prior injuries, the loss of his painting and the rejection of his mail, "is damages or nothing." *Abbasi*, 137 S. Ct. at 1862. *Cf. Vega v. United States*, 881 F.3d 1146, 1154 n.4 (9th Cir. 2018) (concluding that the ARP was a sufficient alternative remedy when the plaintiff raised access-to-court and due process claims because the ARP provides review and procedural process). That Callahan also seeks injunctive relief against future interference with his rights does not detract from the fact that only money damages can redress any previous First Amendment violations. This is especially so because it does not appear that the defendants are able to return either Callahan's painting or his mail.

Second, we consider any other special factors counseling hesitation. Here, Callahan does not challenge a BOP policy, but the actions of FMC officials in applying policies to him. *See Abbasi*, 137 S. Ct. at 1860–61 (denying a *Bivens* remedy when the plaintiff challenged a policy). Thus, a *Bivens* action here would satisfy the purpose of *Bivens*, "to deter the *officer*," here, Quintana and Garcia. *Id.* at 1860 (quoting *FDIC v. Meyer*, 510 U.S. 471, 485 (1994)); *see Carlson*, 446 U.S. at 21. Notably, the defendants do not argue that the ARP deters prison officials.

Additionally, a *Bivens* remedy in this context would not impose significant additional administrative or financial costs on the BOP. Already, we require the exhaustion of possible *Bivens* First Amendment claims in the prison context under the Prison Litigation Reform Act of 1995 ("PLRA"). *See, e.g.*, *Hill v. Lappin*, 630 F.3d 468, 471 (6th Cir. 2010). And in cases where the prisoner seeks in forma pauperis status, as here, complaints are subject to the additional requirements of 28 U.S.C. § 1915 and § 1915A, including the three-strike rule, § 1915(g), and pre-docketing screening, § 1915A. In this procedural posture, we regularly address a variety of First Amendment *Bivens* claims. *See, e.g.*, *Bishawi v. Ne. Ohio Corr. Ctr.*, 628 F. App'x 339, 342–43 (6th Cir. 2014). Additionally, as Callahan's appeal demonstrates, federal officials must already contend with challenges in federal court where the prisoner seeks injunctive or declaratory relief. *See Koprowski*, 822 F.3d at 256–57. Therefore, it is difficult to take seriously the defendants' bald assertion that implying a private cause of action here would result in "an onslaught" of litigation or a "potentially enormous financial burden" on the BOP, particularly given the defendants' lack of any meaningful explanation. Appellee Br. at 9–10.

And Callahan raises an as-applied challenge as opposed to a facial challenge, a distinction that the defendants fail to grapple with, which is much less likely to interfere widely with prison administration.

The majority and the defendants next contend that the PLRA demonstrates Congress's intent not to give federal prisoners a damages remedy. The majority argues that this congressional intent is reflected by Congress's silence in leaving out such a remedy in the PLRA. Majority Op. at 4 (quoting *Abbasi*, 137 S. Ct. at 1865). As the Third Circuit noted, however, Congress's focus was not upon the availability of damages remedies when it enacted the PLRA. *Bistrian v. Levi*, 912 F.3d 79, 93 (3d Cir. 2018). Rather, it was on imposing other gatekeeping requirements to staunch the flow of prisoner litigation—but not to stamp it out completely. *See id.* Thus, it is more likely "that Congress simply wanted to reduce the volume of prisoner suits by imposing exhaustion requirements, rather [than] to eliminate whole categories of [*Bivens*] claims through silence and implication." *Id.* at 93 n.22 (discussing *Abbasi*). Indeed, if the PLRA were such a clear manifestation of congressional intent to deny prisoners such as Callahan an implied private right of action for money damages, the Court's statement in *Malesko*, a post-PLRA decision, that "a federal prisoner in a BOP facility alleg[ing] a constitutional deprivation . . . may bring a *Bivens* claim against the offending individual officer" would make little sense. 534 U.S. at 72.

Similarly, the defendants argue that the PLRA demonstrates Congress's intent "to limit prison litigation," particularly in light of the PLRA's requirements that a prisoner must exhaust any administrative remedies and show a physical injury to collect damages. Appellee Br. at 9. But Callahan has already satisfied these requirements of the PLRA. It is undisputed that he properly exhausted his claims. And Callahan does not need to plead a physical injury because he is not claiming a "mental or emotional injury." 42 U.S.C. § 1997e(e); *Small v. Brock*, __ F.3d ___, No. 19-1841, 2020 WL 3481685, at *3 (6th Cir. June 26, 2020) (explaining "that § 1997e(e) 'does not bar claims for constitutional injury that do not also involve physical injury'" (quoting *King v. Zamiara*, 788 F.3d 207, 213 (6th Cir. 2015))); *see also King*, 788 F.3d at 213–16 (concluding that the plaintiff prisoner could recover compensatory damages for his First Amendment retaliation claim brought under 42 U.S.C. § 1983). If anything, Callahan's case

demonstrates that thus far, congressional intent behind the passage of the PLRA has been honored.

Finally, the defendants argue that it would be difficult "to devis[e] a workable cause of action." Appellee Br. at 9. This argument is a specter. Here, § 1983 provides a well-developed framework for such First Amendment claims. *See Hartman v. Moore*, 547 U.S. 250, 254 n.2 (2006) ("[A] *Bivens* action is the federal analog to suits brought against state officials under [§ 1983]."). In § 1983 cases, federal courts employ the *Turner* analysis to prisoner claims that their constitutional rights were violated. *See, e.g.*, *Flagner*, 241 F.3d at 483–87. Moreover, federal courts apply *Turner* to claims seeking declaratory and injunctive relief against federal officers, which the district court did below. *See Callahan*, 2019 WL 653803, at *3–4. Thus, a *Bivens* action here is an eminently workable cause of action, and the district court erred in not recognizing a *Bivens* cause of action for damages.

## IV. Conclusion

For the reasons set forth above, I would reverse the district court's grant of summary judgment to the defendants on claims for equitable and declaratory relief and also reverse the district court's dismissal of Callahan's *Bivens* claims for money damages. I therefore dissent.